IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2016 Session

## STATE OF TENNESSEE v. KEVIN WELLS

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S62728    James F. Goodwin, Jr., Judge**

_____

**No. E2015-00561-CCA-R3-CD – Filed July 25, 2016**

_____

A Sullivan County Criminal Court Jury convicted the appellant, Kevin Wells, of possession of a Schedule II controlled substance with intent to sell or deliver, a Class C felony; two counts of possession of a Schedule III controlled substance with intent to sell or deliver, a Class D felony; and driving on a revoked license, a Class B misdemeanor, and he received an effective thirteen-year sentence as a Range III, persistent offender. On appeal, the appellant contends that the trial court erred by denying his motion to suppress evidence, by allowing the State to introduce text messages from a codefendant's cellular telephone into evidence, and by admitting his statement into evidence. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

William A. Kennedy (on appeal), Blountville, Tennessee, and Todd East (at trial), Kingsport, Tennessee, for the appellant, Kevin Wells.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry P. Staubus, District Attorney General; and Kent Chitwood, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

In January 2014, the Sullivan County Grand Jury charged the appellant and Angela Graham by presentment with count one, possession of oxycodone, a Schedule II controlled substance, with intent to sell or deliver; count two, possession of buprenorphine, a Schedule III controlled substance, with intent to sell or deliver; count three, possession of diazepam, a Schedule IV controlled substance, with intent to sell or deliver; count four, possession of dihydrocodeinone, a Schedule III controlled substance, with intent to sell or deliver; and count six, possession of a firearm during the commission of a dangerous felony. In count five, the grand jury charged the appellant with driving on a revoked license. The State jointly tried the defendants in December 2014.

Although the appellant does not contest the sufficiency of the evidence, we will summarize the proof presented at trial. Deputy Burke Murray of the Sullivan County Sheriff's Department (SCSD) testified that on January 28, 2013, he was a detective in the Narcotics Division and attended a meeting at the Sullivan County Courthouse. After the meeting, Deputy Murray and several other officers were standing outside when they saw a silver Mustang enter the parking lot and pull into a parking space. Deputy Murray saw the appellant get out of the driver's seat and Graham get out of the front passenger seat and go into the courthouse lobby. Investigator Micah Johnston told the officers that he knew the appellant's driver's license had been revoked. Officer Ray Hayes "called and confirmed" that the appellant's license had been revoked, so the officers went inside the courthouse.

Deputy Murray testified that he and the other officers were in "plain clothes," that he identified himself to the appellant, and that he asked for the appellant's driver's license. The appellant said he did not have a license, and Deputy Murray told him that "we saw you drive in." At that point, Graham "interjected and said that she was driving." Deputy Murray asked for her driver's license, and Graham said that it was in the car. Deputy Murray asked "if we could go get it," and Graham said yes. Graham, Deputy Murray, and Investigator Johnston went outside to the Mustang while Officer Hayes remained inside with the appellant. As the officers and Graham were walking to the car, Investigator Johnston asked her if any knives or guns were in the vehicle, and she told him that two guns were in the trunk. Deputy Murray asked Graham if they could secure the guns, and she opened the trunk and told him that "the guns in the car were hers, belonged to her ex-husband." While Investigator Johnston secured the weapons, Deputy Murray asked Graham about the location of her license. Graham opened the passenger door and said her license was in her purse, which Deputy Murray saw on the front seat. He said that he asked if he could get the purse, that he took the purse off the front seat, and that Graham "pointed to it." Deputy Murray said that he handed Graham her wallet and that she got out her license. Deputy Murray stated that as he had taken the purse out

of the car, he had noticed "a number" of pill bottles in the purse. Deputy Murray "pointed that out" to Officer Hayes, who had come outside to the car. Deputy Murray put the purse on the hood of the car and "got on the phone" to check Graham's driver's license.

Deputy Murray testified that Graham "made the comment that all the medications in there were hers because she saw me looking at the pill bottles in her pocketbook." Officer Hayes asked her "if the counts were right" and for consent to look at the pills. Officer Hayes then asked her "about the pill counts being off," and she said that she had had a death in the family recently and had over-consumed some of her medications. The officers arrested Graham "for the pills found in the car and the guns," and she asked them to get a telephone number for her from her cellular telephone. She gave the officers the passcode for the telephone, and Officer Hayes accessed the telephone and gave her the number. Deputy Murray said that they kept the telephone in order to search it for evidence of distributing and selling the pills.

On cross-examination, Deputy Murray acknowledged that Graham had a valid driver's license. He testified that he and two other officers interviewed the appellant after the appellant's arrest and that they did not record the interview. Defense counsel asked Deputy Murray, "Okay, and [Graham] had recently, like November 10th is when she and Mr. Wells got married[?]" The officer answered, "I don't know that date."

On redirect examination, Deputy Murray testified that during the appellant's interview, the appellant stated that he had a "drug problem," that he had used Roxycontin and Roxicet, and that he often sold Roxicet at work. Roxicet was a Schedule II controlled substance.

Investigator Micah Johnston of the Kingsport Police Department (KPD) testified that in January 2013, he worked in the KPD's Vice and Narcotics Unit. On January 28, he and other officers were outside the Sullivan County Courthouse and noticed a vehicle "pull up." The driver got out of the car, and Investigator Johnston recognized him as the appellant. Investigator Johnston knew that the appellant's driver's license had been revoked and told Deputy Murray because they were in Deputy Murray's jurisdiction. Investigator Johnston verified the status of the appellant's license, the officers went inside, and the officers approached the appellant.

Investigator Johnston testified that after they talked with the appellant, they spoke with Graham. Investigator Johnston and Deputy Murray "escorted" Graham to her car and asked if she had anything illegal in the vehicle. He explained that "we always ask if there are any narcotics, guns, anything of that nature." Graham gave the officers consent to search the car, told them that weapons were in the trunk, and opened the trunk for

them.  Investigator Johnston searched the trunk and found two handguns wrapped in clothing and ammunition in a man's boot.  He found a cigarette pack containing "numerous pills" in the passenger compartment.  At first, he said he found the cigarette pack in the storage compartment of the passenger door.  However, he later stated that he could not remember if he found the pack in the driver's door or the passenger's door.

On cross-examination, Investigator Johnston acknowledged that when he and Deputy Murray walked Graham to her car, Graham had not committed any crime.  Graham was honest with them about the guns in the trunk, and neither gun was loaded.

Officer Ray Hayes of the SCSD testified as an expert in illegal narcotics trafficking in Sullivan County that on January 28, 2013, he attended a narcotics meeting.  Officers were standing outside and saw a gray Mustang pull into the parking lot.  The appellant got out of the driver's seat, and Graham got out of the passenger seat.  Investigator Johnston advised the other officers about the appellant's driving history and checked with his dispatcher about that history.  Officer Hayes also verified the appellant's driving history with his dispatcher.  After Officer Hayes confirmed that the appellant did not have a valid driver's license, the officers arrested the appellant in the courthouse.  Officer Hayes watched officers take the appellant to "booking" and then went outside to assist Deputy Murray and Investigator Johnston with Graham.  The Mustang's trunk was open, and Investigator Johnston was searching it.  Deputy Murray and Graham were standing by the passenger side of the car, and Deputy Murray asked Officer Hayes to search Graham's purse.  Officer Hayes said that they obtained Graham's consent, that he searched the purse, and that he found pills and pill bottles.  Officer Hayes also found pill bottles in and near the center console, and Investigator Johnston gave Officer Hayes a cigarette pack that he had found in the pocket of the driver's door.  The pack contained two white tablets of buprenorphine, also known as Suboxone.

Officer Hayes testified as follows regarding the pill bottles he found:  A pill bottle in the purse was prescribed to Graham and contained two dihyrocodeinone pills.  A second bottle in the purse was prescribed to Graham for promethazine but contained oxycodone.  A third bottle in the purse was prescribed to Graham for oxycodone but was empty.  A fourth bottle in the purse was prescribed to Graham for diazepam and contained diazepam.  A bottle of Equate gas relief pills in the purse contained three pink pills that were oxycodone, fifteen milligrams.  A pill bottle in the console was a prescription bottle, but Officer Hayes could not read "who it's for or anything like that."  A second prescription bottle in the console had Graham's name on it for Suboxone, eight milligrams, but was empty.  Regarding the manner in which the pills were packaged, Officer Hayes stated as follows:

A lot of times when they have illegal narcotics such as pills they will put it in another pill bottle to ---- so a lot of people look at it and see that's what it is, they won't open it up and look inside. So what they do is they put that in there to make somebody look and say, "Oh, that's all it is, it's gas relief," as in the Equate gas relief and they might not look through it but we looked through it and that's what we found, the illegal narcotics.

Officer Hayes testified that in addition to the pill bottles, he also found urine in a "syringe type bottle." The bottle was "in the driver's compartment." After the officers arrested Graham, she said she needed to get a telephone number from her cellular telephone. She gave the officers her "pin" for the telephone, and they accessed the telephone. They gave the number to Graham and collected her telephone as evidence. Officer Hayes later applied for and received a search warrant for the phone. After he executed the warrant, he interviewed the appellant. During the interview, the appellant admitted that he had a "pill problem" and said that he took seven or eight Oxycontins per day. He also stated that he was selling Oxycontin and Suboxone at his place of employment. Officer Hayes asked to search the appellant's cellular telephone, but the appellant refused.

Detective Matthew Price of the SCSD testified as an expert in the forensic analysis of digital devices that he downloaded instant messages to and from Graham's iPhone onto a "thumb drive" and gave the information to Officer Hayes. Over the appellant's objection, Detective Price read some of the messages for the jury. For example, on December 6, 2012, Graham's phone received a message stating, "'I want two if you got it.'" A message sent from Graham's phone replied, "'Okay, yeah, we can prob come by while we are out.'" On December 13, 2012, Graham's phone received a message stating, "'Hey, do you have two or three of those things with you[?]'" On December 26, 2012, a message was sent from Graham's phone that said, "'If you need something I can get Kevin to see you somehow after while if you want.'" About three hours later, the phone received messages stating that "'Rick said he wants two, too, so four altogether'" and that "'They're just 20, right[?]'" Shortly thereafter, Graham's phone sent a message that said, "'He gonna be in the Mustang . . . and he will pull in the back of the corner like we usually do[.]'" On January 2, 2013, Graham's phone sent a message that stated, "'[W]ell I only have three and some people at Kevin's work want some so just text me when you know and if I need to I can get some more in the morning.'" On January 10, 2013, Graham's phone received a message that said, "'God these [f***ing] heads have done nothing but ring my phone off the hook[.]'"

On cross-examination, Detective Price acknowledged that he did not know who sent any of the messages. Defense counsel for the appellant asked if the messages could have been taken out of context, and Detective Price answered, "[A]ll I did was [perform] the extraction and turn my results over to Detective Hayes."

Officer Hayes was recalled by the State and testified that he thought the messages read by Detective Price were pertinent to the investigation of this case. He stated that "heads" in the January 10 message could have been referring to "pill heads," people trying to buy pills for their addiction. At the conclusion of Officer Hayes's testimony, the State rested its case.

Angela Graham testified that she was prescribed oxycodone for pain her in back, legs, knees, and feet in 2006 or 2007. In December 2010, she underwent gastric bypass surgery, lost a lot of weight, and felt like she no longer needed the pain pills. A new doctor prescribed buprenorphine and conducted "pill count[s]" to make sure she was taking the correct amount of medication every month. In November 2012, Graham's gallbladder was removed, which resulted in "a lot of issues" due to the gastric bypass surgery.

Graham testified that in January 2013, she was living in Kingsport with her two teenage daughters "and sometimes Kevin." On January 23, Graham's mother died unexpectedly, and she was "very upset." She said she had a prescription for diazepam, also known as Valium, and she acknowledged that five pills were missing from the bottle when she was arrested on January 28. She said that she had consulted her doctor and that he had told her that she could "take a couple of extra considering the circumstances." In addition to her prescriptions for buprenorphine and diazepam, Graham also had prescriptions for oxycodone and dihydrocodeinone.

Graham acknowledged that on January 28, she told the officers that she was driving the Mustang. The officers handcuffed the appellant, and Graham asked them not to take him to jail. The officers asked to see her driver's license and "escorted" her to the car. Graham told the officers that two guns were in the trunk. She told the jury that the guns and boots in the trunk belonged to her ex-husband, whom she had divorced in June 2012. Graham acknowledged that the pills in the purse and the cigarette pack were hers and said that she had to take gas pills every day for the rest of her life. She stated that she "overlooked" having the wrong pills in the wrong bottles.

Graham testified that the appellant worked for Hutchinson Sealing and made seals for speaker boxes. She stated that she helped him and that the messages sent to her iPhone and read by Detective Price were referring to the seals or energy drinks. She said she did not sell prescription drugs.

- 6 -

On cross-examination, Graham testified that she did not send all of the messages from her iPhone. She said that she did not give the officers the passcode for her phone and that they obtained access to the phone by answering it when the appellant called her from jail. She acknowledged that the January 10 message about "heads" was sent to her from the appellant's telephone but denied knowing that the appellant was selling drugs. She maintained that the messages in question were referring to speaker seals.

At the conclusion of the proof, the jury found the appellant and Graham guilty as charged of count one, possession of oxycodone with intent to sell or deliver, a Class C felony; count two, possession of buprenorphine with intent to sell or deliver, a Class D felony; and count four, possession of dihydrocodeinone with intent to sell or deliver a Class D felony. The jury also convicted the appellant of count five, driving on a revoked license, a Class B misdemeanor. The jury found the appellant and Graham not guilty of count three, possession of diazepam with intent to sell or deliver, and count six, possession of a firearm during the commission of a dangerous felony. After a sentencing hearing, the trial court sentenced the appellant as a Range III, persistent offender to concurrent sentences of thirteen years in count one and ten years in counts two and four. The trial court sentenced the appellant to six months in count five and ordered that it be served concurrently with the other three sentences for a total effective sentence of thirteen years.

## II. Analysis

### A. Motion to Suppress

The appellant contends that the trial court erred by denying his motion to suppress evidence obtained from the officers' search of the Mustang and Graham's purse because the officers "illegally detained" the appellant, had no probable cause to believe Graham had committed a crime, had no right to "instruct" Graham to provide her driver's license, and had no reason to question her about the pills or investigate the pill bottles when "there is nothing inherently suspicious in the presence of prescription bottles in a purse." The State argues that the trial court properly denied the motion to suppress. We agree with the State.

Before trial, the appellant and Graham filed motions to suppress the evidence obtained in this case. In the appellant's motion, he argued that the officers could have checked the status of Graham's license "through Central Dispatch" as they did the

appellant's license and that "the search and seizure of Defendant Graham's personal vehicle were illegal, unlawful, [and] unreasonable."[1]

At the hearing on the motions, Deputy Murray testified as he did at trial that the officers saw the appellant get out of the driver's seat of the Mustang, that the appellant and Graham went inside the courthouse, and that Officer Hayes verified that the appellant's license had been revoked. The officers went inside, Deputy Murray asked the appellant for his license, and Graham "spoke up and said that she was driving the car." Deputy Murray knew Graham had not been driving and asked her for identification. Graham told him that it was in the car, and he asked "if we could get it." Graham said yes and walked outside to the car with Deputy Murray and Investigator Johnston. Deputy Murray stated that Investigator Johnston asked Graham "if there was anything illegal in the car; guns, knives, drugs, or anything," that she told them guns were in the trunk, and that she gave them the keys to open the trunk. While Investigator Johnston secured the weapons, Deputy Murray asked Graham about her driver's license, and Graham pointed to her purse on the passenger seat. Deputy Murray asked Graham if he could get her license, and she said yes. He opened the car door, and she told him that her license was in her wallet. Deputy Murray opened the purse, pulled out the wallet, and obtained Graham's driver's license. He said that as he was taking the wallet out of her purse, he saw pill bottles in the purse.

Deputy Murray testified that he pointed out the pill bottles to Officer Hayes, who had come outside, and asked Graham if the pills had been prescribed to her. She said yes, and he asked her, "'Are all the pill counts right?'" She said yes but that she "might have taken a few too many" due to a recent death. Deputy Murray asked if they could look through the purse, and she again said yes. Graham also told Investigator Johnston that he could "go ahead and look" inside the car. Investigator Johnston searched the passenger compartment and found a pack of cigarettes containing pills in the driver's door. Deputy Murray said that Officer Hayes began questioning Graham about the pills in her purse being in the wrong bottles and that Graham became "very irate." At that point, Officer Hayes arrested her. Deputy Murray said that Graham never appeared afraid, that she was not reluctant to answer his questions, and that she was "voluntarily giving more [information] than I was asking for most of the time." He said he never told Graham that she was not free to leave.

On cross-examination, Deputy Murray testified that his attention was drawn to Graham when she lied to him about driving the car. He said that he initially asked Graham for her "identification," not her driver's license, and that the officers accompanied Graham to the car for officer safety because they had just arrested her

---

[1] Graham's motion is not included the record.

husband.  He acknowledged that there was no reason the officers could not have checked the status of Graham's license from inside the courthouse.

Investigator Johnston testified that he recognized the appellant when the Mustang pulled into a parking space, that he knew the appellant and Graham were possibly involved in the sale of narcotics, and that he knew the appellant did not have a valid driver's license.  After Investigator Johnston verified the status of the appellant's license, the officers went inside the courthouse, and Deputy Murray approached the appellant.  Graham told the officers that she had been driving, Deputy Murray asked Graham for her driver's license, and she said it was in the car.  Investigator Johnston and Deputy Murray went to the car with her, Investigator Johnston secured the guns in the trunk, and Graham gave him consent to search the car.

On cross-examination, Investigator Johnston testified that when the officers entered the courthouse, Graham had not done anything illegal.  After she lied about driving the Mustang, Deputy Murray asked to see her "ID," and she told him it was in the car.  He then asked her, "'Well, can we go get it?'"  Investigator Johnston said he did not remember Graham's giving a response to Deputy Murray's question.

Officer Hayes testified that he arrested the appellant and "went back out to the vehicle."  The trunk of the Mustang was open, and Deputy Murray was talking with Graham.  Deputy Murray advised Officer Hayes about what he had seen in the purse and asked Graham for consent to search it.  Graham said yes, and Officer Hayes looked through the purse.  He said he was not present when Graham gave consent to search the car.

Angela Graham testified that on January 28, 2013, she and the appellant went to the courthouse "[t]o pay his last $200 fine so he could get his license back."  At least four officers came into the clerk's office and asked the appellant if he was "Kevin Wells."  They said he was under arrest, and Graham told them that she was driving.  The appellant had the car keys, so the officers arrested him and removed him from the scene.  Deputy Murray asked Graham for her identification or driver's license and told her, "'We need to see them.'"  Graham said she never felt that she was free to leave because the officers were "surrounding" her.

Graham testified that she told the officers that her identification and driver's license were in the car.  Three officers "escorted" her to the Mustang, and Deputy Murray kept his hand on her shoulder as they walked.  She said that she was told, not asked, to provide her license and that she never gave consent for the officers to search her car or purse.

On cross-examination by the State, Graham acknowledged that no one ever told her that she was not free to leave. The officers did not ask for consent to secure the guns but told her that they needed to secure them and to open the trunk. After Graham opened the trunk, she opened the car door and took her purse off the passenger seat in order to obtain her license. She stated, "And that's when they stepped in, I guess. They said they seen the pill bottles which were mine. And that's when they stepped in and got - they got it theirself and started going through my purse." She said that her mother's ring was in her purse and that she became irate because Deputy Murray "slung it out."

At the conclusion of Graham's testimony, her counsel argued that the officers "seized" her in the courthouse despite the fact that she had not committed any crime and, therefore, that any evidence obtained from the illegal seizure should be suppressed. Counsel for the appellant did not question any of the witnesses or make any argument at the hearing.

The trial court ruled that the admissibility of the evidence "boils down to credibility." The court accredited the officers' testimony and found Graham not credible. The court noted that while the officers were testifying, Graham "sat there and rolled her eyes. She kind of kicked her elbow over at Mr. Wells one time. But I'm not sure if it's to wake him up because he appears to be asleep right now." The trial court stated that in addition to Graham's demeanor, "I have problems with some of the things she said because . . . I think she's trying to fit her testimony, not just give me an honest rendition of what she remembered happening." The trial court stated that it "[didn't] believe . . . for a minute" that Deputy Murray kept his hand on Graham's shoulder as they walked to the car because "that's a sexual harassment suit waiting to happen" or that the officer threw her mother's ring out of the purse. The trial court went on to state, "And it's these little things that I don't believe. And it calls into question her whole testimony." The trial court found that the initial encounter between the officers and Graham was consensual and that she gave them consent to search the trunk and the purse. The court went on to state that the appellant did not have standing to challenge the admissibility of the evidence because "[t]he testimony was it was her car."

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and

legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search or seizure is considered presumptively unreasonable, and, thus, violative of constitutional protections. State v. Davis, 484 S.W.3d 138, 143 (Tenn. 2016). However, "one of the exceptions to the warrant requirement is a search conducted pursuant to consent." State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973), and State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends largely upon the facts and circumstances in a particular case." Jackson, 889 S.W.2d at 221. Whether consent exists and "'whether it was voluntarily given are questions of fact.'" State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983)). The prosecution bears the burden of proving that the defendant freely and voluntarily gave consent. See McMahan, 650 S.W.2d at 386.

As to the appellant's claim that he was illegally detained, we disagree. The officers saw the appellant driving the Mustang, and Investigator Johnston knew that the appellant did not have a valid driver's license. The officers even verified the status of the appellant's revoked license before confronting him. Thus, the officers had probable cause to arrest the appellant. See Beck v. Ohio, 379 U.S. 89, 91 (1964) (providing that another exception to the warrant requirement is an arrest by an officer who has probable cause to believe that a defendant has committed a crime).

Turning to the evidence seized from the purse, the purse belonged to Graham, and nothing indicates that the appellant had a legitimate expectation of privacy in the purse. Thus, he has no standing to challenge the officers' searching it. See Rawlings v. Kentucky, 448 U.S. 98, 104-06 (1980). In any event, the trial court found that Graham freely and voluntarily consented to the search of her purse, and nothing in the record preponderates against that finding. As to the evidence seized from the car, specifically the pills discovered in the passenger compartment, the trial court found that the appellant lacked standing to challenge the search of Graham's car. During oral argument, the appellant alleged that the trial court erred because he and Graham were married at the time of the search and, therefore, he had a legitimate expectation of privacy in the vehicle. However, even assuming arguendo that the appellant had a legitimate expectation of privacy in the Mustang, the trial court firmly accredited the testimony of the officers, who stated that Graham consented to a search of the car. Again, nothing

from the suppression hearing or trial preponderates against the finding of the trial court. Accordingly, we conclude that the trial court properly denied the appellant's motion to suppress.

## B. iPhone Messages

Next, the appellant contends that the trial court erred by allowing the State to introduce the instant messages to and from Graham's iPhone into evidence in violation of Rule 404(b), Tennessee Rules of Evidence. The State claims that the appellant has waived this issue. We agree with the State and conclude that the appellant is not entitled to plain error relief.

Before trial, the appellant filed a motion in limine to exclude any reference to telephone text messages sent by the appellant or Graham. At trial, the appellant argued that the text messages were speculative, that they were "much more" prejudicial than probative, and that the State was "using past instances to try and convict them." The State responded that even if the text messages were evidence of prior bad acts, they were admissible to show the defendants' intent. The trial court agreed with the State, stating that the texts "came in a very short time before January 28th," that they were probative to the defendants' intent, and that the probative value of the texts was not outweighed by the danger of unfair prejudice. Prior to Detective Price's testimony, the appellant renewed his objection to the text messages. The trial court overruled the objection, and Detective Price read the instant messages to and from Graham's iPhone into evidence.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue

exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

      (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

      (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The State claims that the appellant has waived this issue because he failed to raise it in his motion for new trial. We agree. In his motion, the appellant stated that "Defendant did not send any text messages presented in trial and any inference of Defendant's guilt may not be inferred from a Co-Defendant's text[s] that were not in relation to the time referred to in the indictment and were speculative to their meaning." The appellant did not raise the admissiblity of the messages pursuant to Tennessee Rule of Evidence 404(b) in his motion for new trial or at the hearing on the motion. See Tenn. R. App. P. 3(e). Nevertheless, we can review the issue for plain error. Tenn. R. App. P. 36(b); see State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015).

We may consider an issue to be plain error when all five of the following factors are met:

      (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Here, the State was required to show that the appellant knowingly possessed the pills with intent to sell or deliver them.  See Tenn. Code Ann. § 39-17-417(a)(4). Although the messages at issue did not specifically mention "pills," they discussed the delivery of small numbers of items and the appellant's use of the Mustang, in which the police later found pills, to deliver those items.  The trial court held a hearing outside the jury's presence, ruled that the instant messages were relevant to the defendants' intent to sell pills, and ruled that the probative value was not outweighed by the danger of unfair prejudice.  The court obviously found that proof of the other crime, wrong, or act was clear and convincing.  Thus, we conclude that no clear and unequivocal rule of law was breached and that the appellant is not entitled to plain error relief.

## C.  Defendant's Statement

Finally, the appellant contends that the trial court erred by allowing Deputy Murray to testify that the appellant said he had a drug problem and often sold drugs at work.  He contends that the admissions were "so vague in time as to render [them] useless" and should have been excluded pursuant to Rule 404(b), Tennessee Rules of Evidence.  However, the appellant did not object to the admissibility of his statements at trial, did not request a 404(b) hearing, and did not raise the issue in his motion for new trial.  Therefore, we conclude that the issue has been waived.  See Tenn. R.App. P. 36(a), 3(e).

## III.  Conclusion

Based upon the oral arguments, the record, and the parties briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE